**PERKINS, Plaintiff-Appellant, v. BENGUET CONSOLIDATED MINING COMPANY et, Defendants-Appellees.**

Ohio Appeals, First District, Clermont County.

Nos. 181, 182.   Decided January 27, 1950.

534

Gorman, Silversteen & Davis, Cincinnati, for plaintiff-appellant.

Ely, White & Davidson, Nichols, Speidel & Nichols, Batavia, Lucien H. Mercier, for defendants-appellees.

## OPINION

Per CURIAM:

Two actions were commenced in the Court of Common Pleas of Clermont County. Service of summons was made in each case upon the defendant, by delivering to John W. Haussermann a copy of such summons. He was so served as "Parent, President, and General Manager, Controlling Member, and the duly authorized representative in the United States" of the defendant.

Motions to quash, with proper reservation as to appearance, were filed and sustained by the trial court. From such ruling of the trial court, appeals on questions of law have been taken by the plaintiff and are now herein considered.

Essentially, two main issues are presented to this court.

(a) Is the defendant a foreign corporation within the purview of the law of Ohio?

(b) If so, was the defendant doing business in Clermont County at the time summons was made upon Haussermann?

No difficulty is encountered in returning an affirmative answer to the first query. It appears to be clearly demonstrated by the record that the defendant is a corporation organized and existing under the laws of the Phillipines, and, therefore comes within the provisions of §8625-2 GC, defining the terms "Foreign Corporation" and "State."

The articles of incorporation and the applicable Phillipine law sustain this conclusion.

The second query is not so easily disposed of and involved consideration of many authorities, which, at least, seem to be conflicting.

The facts upon which plaintiff predicates her claim that the defendant was in this State and doing business in Clermont County are as follows:—

(1) The defendant "opened accounts in The First National

Bank of Cincinnati and the New Richmond National Bank of New Richmond, Ohio (Clermont County) in January and April of 1942, respectively, in the name of its President John W. Haussermann."

(2) "The accounts remained open for five years until April, 1947." "Considerable activity was revealed throughout the entire period of their existence, but particularly in the last eighteen months."

(3) "No one but John W. Haussermann ever possessed the authority to draw on these accounts."

(4) Neither Bank has in its possession any authority, either by way of corporate resolution or otherwise, for the establishment of these accounts."

(5) "A directors' meeting of the Benguet Consolidated Mining Company was held at Pond Run Farm, the New Richmond home of Haussermann on January 23, 1946, at which meeting authority was given to the First National Bank to act as transfer agent for the transfer of shares of the Benguet Company stock."

(6) "The First National Bank so acted as transfer agent from that date on."

(7) "The Bank is a true transfer agent to the extent that no separate authority nor individual correspondence is required from the principal office of the Company in Manila to effect the transfer of shares of stock."

(8) An office was maintained in a New Richmond Bank Building—claimed not used for any purpose in connection with the bank.

(9) Two secretaries employed by Haussermann in such office.

(10) Haussermann seen daily at such office.

(11) Haussermann admits possession of the Perkins' stock—now in dispute in these actions.

(12) Deposits of defendant's funds were made from Haussermann's office in local banks.

(13) Defendant "had applied for and secured a Foreign Funds' Control Commission license for the expenditure of Twenty-two Thousand ($22,000.00) Dollars for office rent and salaries in the United States."

(14) Correspondence by Haussermann with local banks—pertaining to "handling and payment of the various funds and credits on deposit * * * directing of forwarding drafts on New Richmond Bank to various individuals and companies throughout Ohio and the United States."

(15) Haussermann signed "purchase orders for various supplies and machinery which were to be shipped to the Company's mines in the Phillipines."

(16) Haussermann signed checks for obligations of the company thus incurred.

(17) "In the registration statements filed with the Securities Exchange Commission, he styles himself the President, General Manager, and the duly authorized representative of the Benguet Consolidated Mining Co. in the United States."

(18) At a directors' meeting held as late as January 28, 1946, at Haussermann's house, The First National Bank of Cincinnati was designated as transfer agent for Benguet and no separate authority from Manila or elsewhere is necessary to effect a transfer of shares."

(19) "Haussermann maintains an office in the New Richmond Bank Building."

(20) "He employs two secretaries in that office."

(21) "Considerable correspondence about Benguet was carried on from this office concerning Foreign Funds Control Commission license, handling and payments of funds, forwarding drafts and the like."

(22) "Here in New Richmond, Haussermann admitted he signed purchase orders for supplies and machinery and signed checks for the payment of them."

(23) "Haussermann received as a salary as President and General Manager of the Company in 1945 the sum of $12,000.00, and $12,000.00 as President and General Manager of Balatoc."

24) "Albert, Assistant Secretary, Jean M. Gorrdon, Assistant to the President, who was in New Richmond, and Francis O. Haussermann all were paid salaries in 1946."

(25) "Officer's salary, office rent, secretarial help and the like were all paid for by the activities Haussermann carried on in New Richmond."

On the other hands, the defendant points to the following evidence, claimed to sustain the conclusion that the defendant was not in Clermont County—and did not "do business" therein:

(1) The defendant is a corporation created and existing under the laws of the Phillipines and engaged in the business of mining gold and silver in the Phillipine Islands.

(2) The corporation, as such, has never maintained an office in the State of Ohio.

(3) It has never sold any gold or silver in Ohio.

(4) "No production of gold or silver having taken place because of the War since December, 1941 to the date of these suits."

(5) John Haussermann lived in the Phillipines since 1898.

(6) He is the Company's president and general manager, and has been such for many years.

(7) He organized the Company in 1903.

(8) "He came to Ohio in May, 1941, to attend to personal family matters with reservations to return to the Phillipines in September, 1941."

(9) He was prevented from so returning to the Phillipines by War restrictions which cancelled his reservations of September, October, and November, 1941.

(10) He made continuous efforts to secure passage to the Phillipines from December, 1945 to January, 1947, and succeeded in securing a reservation in August, 1947.

(11) During the time when he was thus forced to stay in the United States, he made his home on his farm in Clermont County.

(12) During the period from 1942 to the date of these suits "he lived there less than half of the time."

(13) Since 1906 he has had "what he calls an office for a loafing place in New Richmond, Ohio, every time he came to the United States on vacation."

(14) He built a building "to house the First National Bank of New Richmond, of which he was President, and in the lease to the Bank, he reserved an office for himself for his loafing place."

(15) "In which office no business people pertaining to Benguet ever came."

(16) "He did some banking business pertaining to the Bank in that office, and the townsfolk of New Richmond visited with him there."

(17) During his stay in the United States in the war years "when it was impossible to communicate with the Phillipines he did what he could to protect the shipments of machinery, supplies and equipment which were returned to the East and West Coast because he was the only one in the United States who could do so."

(18) "In 1942 as a war expediency and because of the Foreign Funds Control Law, he transferred the Company's funds from a California bank to accounts in his name in the First National Bank of Cincinnati, and in the New Richmond Bank.

(19) It is stipulated that these funds in Clermont County were the property of the defendant, hence, under §11,276 GC, the venue of the action is properly laid in Clermont County.

(20) "Benguet's surface properties at the mines in the Phillipines were all destroyed during the war; and when the war was over, and in 1946, Benguet began rebuilding its properties in the Phillipines, which required the purchase

of machinery, supplies and equipment. Benguet·had no funds in the Phillipines, but did have those funds in the two Ohio banks. The Phillipines had no machinery, supplies and equipment, and all of this had to be purchased in the United States. To transfer the funds in the Ohio banks to the Phillipines, and then from the Phillipines to the United States would have entailed an expense for exchange."

(21) "This machinery, supplies and equipment was all negotiated for and purchased by Benguet's Purchasing Agent in San Francisco, on the direction of the Company's Chief of Staff in Manila; and Judge Haussermann never negotiated for or purchased a single piece of machinery, supplies or equipment."

(22) "None of these items of machinery, supplies and equipment were purchased from any Ohio concern by the Company's Purchasing Agent."

(23) "The suppliers mostly always insisted on the formal orders being signed by a Company official, and, accordingly, after Benguet's Purchasing Agent had negotiated for and purchased the items, she would prepare the formal orders for the same and send them to Judge Haussermann for signature."

(24) "This began in March, 1946—and he would then do the purely ·ministerial act of signing the orders wherever he might happen to be, whether in New Richmond, New York, Washington, Chicago, San Francisco, or elsewhere wherever the mail reached him."

(25) "Checks on the Ohio banks were also signed by him—and all of these checks save those for his salary, and for a while that of an Assistant Secretary of the Company, were drawn in the amount, and to the order, as directed by the Company's Chief of Staff and by Benguet's Purchasing agent."

(26) "Two or three, out of nine, meetings of the Board of Directors were held at Judge Haussermann's home at New Richmond, Ohio, the others having been held at Washington, New York, San Francisco and otherwise than at New Richmond, Ohio."

(27) "During the war years, three out of the five Directors of Benguet were interned in the Phillipines by the Japanese."

(28) "In May, 1945, John W. Haussermann, Jr., son of Judge Hausserman, was elected a Director to replace a Director who had been killed by the Japanese in December, 1944."

(29) "Benguet's Secretary returned to ·the United States from internment by the Japanese in May, 1945."

(30) "In 1946, a large shareholder (Allen & Company of New York) wanted to dispose . of over 700,000 shares of Benguet, and Judge Haussermann, on behalf of Benguet and

to assist this shareholder, supplied to the Securities and Exchange Commission all of the information pertaining to Benguet which was demanded by the Exchange before authorizing the listing and sale."

\* \* \* \*

Does this evidence show that the defendant, as a foreign corporation, was in Ohio and doing business therein?

It is claimed by plaintiff that the term "doing business" has differing significance according to the subject-matter of the proceeding in which the term is involved. Beach v. Kerr Turbine Co., 243 Fed. 706, is cited in support of this contention. At page 708 of the opinion, after citing a number of authorities, it is stated:

"I have examined all of these cases and many others. In my opinion, they are not controlling; in fact, they do not bear on the exact point under consideration. Several of them involve statutes which forbid a foreign corporation to do business within a state without complying with state laws, and in some instances prohibiting action on the contracts if such compliance has not been had. Others involve state statutes forbidding or regulating the doing of business within their limits, or imposing local taxes upon interstate commerce."

And, continuing, it is stated:

"The question involved in this action, however, seems to me to be different, and is controlled by other considerations. It does not follow that statutes fixing the conditions under which a foreign corporation may engage in business in a state are to have the same construction as statutes permitting a foreign corporation to be served in a state where it may be found. In the former it is, of course, a more or less continuing course of business which is meant to be regulated, whereas in the latter the object sought is only to give notice to a corporation of a pending action. The tendency is to hold that whatever is reasonably effective for this purpose is a good service."

In this connection, see: Tauza v. Susquehanna Coal Co., 220 N. Y. 259; International Shoe Co v. Washington, 326 U. S., 310, 316.

In International Harvester Co. v. Kentucky, 234 U. S., 579,— The International Harvester Company was indicted in Kentucky for violation of the Anti-Trust Laws of Kentucky. The question of process upon the defendant was in issue. At page

582 of the opinion it is stated: "This case presents the question of the sufficiency of the service of process on an alleged agent of the International Harvester Company in a criminal proceeding \* \* \*" In the headnotes, it is stated:

"It is essential to the rendition of a personal judgment against a corporation that it be doing business within the State; but each case must depend upon its own facts to show that this essential requirement of jurisdiction exists.

"The presence of a corporation within a State necessary to the service of process is shown when it appears that the corporation is there carrying on business in such sense as to manifest its presence within the State, although the business may be entirely interstate in its character.

"The fact that the business carried on by a corporation is entirely interstate in its character does not render the corporation immune from the ordinary process of the courts of the State."

At page 267 of the opinion in Tauza v. Susquehanna Coal Co., 220 N. Y. 259, supra, it is stated:

"But the problem which now faces us is a different one. It is not a problem of statutory construction. It is one of jurisdiction, of private international law (Dicey Conflict of Laws, pp. 38, 155). We are to say, not whether the business is such that the corporation may be prevented from being here, but whether its business is such that it is here. If in fact it is here, if it is here, not occasionally or casually, but with a fair measure of permanence and continuity, then, whether its business is interstate or local, it is within the jurisdiction of our courts (International Harvester Co. v. Kentucky, supra, at p. 587). To hold that a state cannot burden interstate commerce, or pass laws which regulate it, 'is a long way from holding that the ordinary process of the courts may not reach corporations carrying on business within the state which is wholly of an interstate commerce character' (234 U. S. at p. 588). The nature and extent of business contemplated by licensing statutes is one thing. The nature and extent of business requisite to satisfy the rules of private international law may be quite another thing. In saying this we concede the binding force of the decision of the Supreme Court in Riverside & Dan River Cotton Mills v. Menefee (237 U. S. 189) and kindred cases (Bagdon v. Philadelphia & Reading C. & I. Co., 217 N. Y. 432, 438; Pomeroy v. Hocking Valley Ry. Co., 218 N. Y. 530). Unless a foreign corporation is engaged in business within

the state, it is not brought within the state by the presence of its agents. But there is no precise test of the nature or extent of the business that must be done. All that is requisite is that enough be done to enable us to say that the corporation is here (St. Louis S. W. Ry. Co. of Texas v. Alexander, 227 U. S. 218; Washington-Virginia Ry. Co. v. Real Estate Trust Co. of Philadelphia, 238 U. S., 185; Int. Harvester Co. v. Ky., supra; Pomeroy v. Hocking Valley Ry. Co., supra). If it is here it may be served (Halsbury, L. C., in La Compagnie Generale Transatlantique v. Law, L. R. (1899 A. C.) 431)."

In 20 C. J. S. p. 45, "Corporations" section 1828, it is stated:

"Statutes regulating foreign corporations apply only when they are doing business within the state, and a distinction exists between the doing of business so as to be amenable to service of process and the doing of business so as to be subject to regulatory statutes."

In section 1920, a. Id., it is stated:

"The nice question as to what constitutes doing business in the state so as to render a foreign corporation suable must be determined largely from the facts of each case rather than by an all embracing rule.

"The determination of the question whether a foreign corporation is doing business within a state so as to be subject to suit therein is often a matter of difficulty and of extreme nicety. In determining the question the courts have enunciated certain general principles hereinafter discussed and have stated generally that the foreign corporation must have entered the domestic state for the purpose of carrying on its business there, and that the transaction of business must be such that the corporation is for the time being within the state in which it is sued. Nevertheless, no all-embracing rule as to what is 'doing business' has been laid down. **The question is one of fact, and it is to be determined largely according to the facts of each individual case rather than by the application of fixed, definite, and precise rules.** (Emphasis ours.)

"The question whether a foreign corporation is doing business in the state in such a sense as to make it amenable to the jurisdiction of the courts thereof is not one of local law or of statutory construction; it is one of jurisdiction, or general law, or private international law, and in the last analysis

is one of due process of law under the constitution of the United States. However, to some extent at least, a state has the power to say what will constitute corporate presence within its borders."

Later on, in the same section, it is stated:

"the corporation may be doing business within the state so as to render it subject to the jurisdiction thereof, even though the business done is interstate rather than local. Indeed, where a state has enacted two statutes relating to suits against foreign corporations, the effect of one of which is to make foreign corporations transacting local business in the state domestic corporations as to such business and subject to the same remedies in the courts of the state, the other statute will be construed to be limited in its application to foreign corporations transacting interstate commerce business in the state."

In Section 1920, b, it is stated:

"The character and extent of the business done must warrant the inference that the foreign corporation has subjected itself to the jurisdiction of the state. The business must have some continuity but it may be done by an unlicensed corporation or by a withdrawing corporation."

And later in the same section it is stated:
"The business which a foreign corporation is conducting in the state, in order to give the courts of the state jurisdiction over it by proper service of process, **must be a part of the business for which it was organized, or at least a part of the usual and ordinary business in which it is engaged.** Nevertheless it is not necessary that the transactions in the state of the foreign corporation shall be the performance of those particular acts which constitute the characteristic feature of the business for which it was organized." (Emphasis ours.)

On page 168, Id., 2, (9) it is stated:

"It cannot be said to be clear whether or not transactions by a foreign corporation's agent involving the transfer of its stock in the state constitute a doing of business therein."

And:

"The mere fact that a foreign corporation doing all of its business outside the state has acted as transfer agent for a sale of securities within the state will not bring it into the state for purposes of jurisdiction of a suit against it."

To the same effect are statements in Am. Jur., See: Foreign Corporations, Section 490, page 482; Section 495, page 498; Section 369, page 352; Section 370, page 353.

In Section 377, Id., page 371, it is stated:

"As heretofore observed, a foreign corporation may be held to be doing business in the state in such a sense as to bring it within a statute relating to the venue of suits or to render it amenable to the jurisdiction and process of the local courts, * * *"

See, also: Section 361, Id., page 335, as to "What Constitutes" —doing business in a state. Also, Section 363, Id., page 341— "For Purposes of Jurisdiction and Service of Process." Section 364, Id., page 344, Section 365, Id., page 346, dealing with particular transactions.

See, also: "Words and Phrases" Vol. 13, page 126, "Doing Business."

In St. Louis Southwestern Ry. Co. v. Alexander, 227 U. S., 218, it is held:

"In order to hold a corporation personally liable in a foreign jurisdiction it must appear that the corporation was within the jurisdiction and that process was duly served upon one of its authorized agents.

"A corporation is not amenable to service of process in a foreign jurisdiction unless it is transacting business therein to such an extent as to subject itself to the jurisdiction and laws thereof.

"Under the Carmack Amendment the initial carrier is not liable to suit in a foreign district unless it is carrying on business in the sense which would render other foreign corporations amenable to process. No all embracing rule has been laid down as to what constitutes the manner of doing business by a foreign corporation to subject it to process in a given jurisdiction. Each case must be determined by its own facts.

"The business done by a foreign corporation must be such in character and extent as to warrant the inference that it has subjected itself to the jurisdiction."

It must be apparent that no useful purpose would be served by comparing or considering the host of authorities to be found upon this question. Enough has been noted herein to indicate the general rules applicable and that essentially a factual issue is presented to the trier of facts, which in the cases before the court was the trial judge.

The trial court upon such consideration of the evidence presented found in favor of the defendant upon the motion to quash. It cannot be said that his conclusion was contrary to law, or that, as a matter of law, he was in error in finding that the motions to quash should be sustained. His judgment is before this court, predicated upon the evidence before him. The record does not sustain the claim of the plaintiff that he was in error, either upon the law or the facts. In this connection, the conclusion of Bell, J., of the Common Pleas Court of Hamilton County, is before the Court urged as an authority by the plaintiff. The record presented to the trial judge in Clermont County, while it included the record before Bell, J., was more extensive than that presented to the Hamilton County Court. Bell, J., was the trier of the facts presented to him in the action before the Hamilton County Court. This Court is not reviewing either the law or the facts considered by the Hamilton County Court, and nothing said herein is to be considered as a pronouncement upon the judgment of such court. The judgment of that court is not before this Court for review.

Other claims have been advanced by the plaintiff and considered among these is the claim that the defendant is estopped to assert now that it is a foreign corporation. The factual predicate for this claim is not present in the record. There is no basis for this claim requiring this Court to find for the plaintiff.

The record does not justify the claim that there has been a general entry of appearance by the defendant.

The extensive record and elaborate briefs presented to this court have required deliberate consideration of the issues of law and fact involved in the respective contentions of the parties.

The conclusion is that no error, prejudicial to the plaintiff appears affirmatively in the record and that, therefore, the judgments of the trial court on the motions to quash must be and are sustained.

ROSS, PJ, HILDEBRANT & MATTHEWS, JJ, concur.